IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY, | § § § | |
| *Plaintiff,* | § § | 5:23-CV-00888-XR |
| vs. | § § | |
| LP OPERATING, LLC, | § § § | |
| *Defendant.* | § § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Xavier Rodriguez:**

This Report and Recommendation concerns Plaintiff St. Paul Fire and Marine Insurance Company's Motion for Summary Judgment ("Motion"). *See* Dkt. No. 25. The District Court referred the motion for resolution, pursuant to Rules CV-72 and 1 of Appendix C to the Local Rules for the United States District Court for the Western District of Texas. *See* August 27, 2024, Text Order. Authority to enter this recommendation stems from 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, Plaintiff's Motion for Summary Judgment should be **GRANTED IN PART** and **DENIED IN PART**.

**Factual and Procedural Background**

Plaintiff St. Paul Fire and Marine Insurance Company ("St. Paul") issued Defendant LP Operating, LLC ("LPO") an insurance policy with a coverage period spanning from January 12, 2021, through January 12, 2022. *See* Motion, Ex. 2 (the "Policy") at 2; Motion at 1. The Policy describes the coverage provided as well as exclusions from coverage. Once executed, the Policy

obligated St. Paul to defend or indemnify (or both) LPO in circumstances where LPO faced litigation arising from covered events and circumstances. *See generally* Policy at 54.

On April 18, 2023, neighboring landowners sued LPO in state court, alleging that discharges of wastewater from LPO's property damaged their land. *See* Dkt. No. 1 ("Complaint") at ¶ 11; *see also Bingham et al. v. LP Operating, LLC*, Cause No. 23-04-0258-CVA, 81st-218th District Court of Atascosa County, TX. The landowners' state court petition alleged the following in its "Facts" section:

> LP Operating, LLC, owned, operated, managed, and controlled an oil field byproduct wastewater disposal well . . . adjacent to Plaintiffs' ranch.

Motion, Ex. 1 ("Petition") at ¶ 10.

> Defendant [LPO] caused wastewater from the Disposal Well to be discharged over containment berms, and into, over, and across the Ranch. Defendant caused the exact same scenario to occur again on or about August 2021, but permitted even more wastewater to enter and pollute the Ranch the second time around.

*Id.* at ¶ 11.

> As a result of Defendant's actions and/or inactions, the Ranch is now contaminated with environmental pollutants, some of which have been identified as salts, that have saturated the ground rendering it toxic to vegetation in the affected and surrounding areas.

*Id.* at ¶ 12.

The Petition alleged, under its "Causes of Action" section that:

> "Defendant's discharge of oilfield byproduct wastewater across Plaintiffs' property has caused substantial injury to the Plaintiffs' private property. The Ranch has an approximately one-half mile long and twenty foot wide drainage area in which all vegetation has ceased to grow since Defendant's two wastewater discharges. The damage incurred has greatly interfer[ed] with Plaintiffs' interests and enjoyment, as well as use of their land and such impairment will remain until the property is restored to its previous state."

*Id.* at ¶ 13. The Petition brought private-nuisance and trespass claims against LPO. *Id.* at ¶ 13-17.

LPO learned of the two discharge events on or about June 14, 2021, and August 27, 2021. Motion, Ex. 3-A at 2-3. LPO notified its insurance broker of the underlying state lawsuit on or about April 28, 2023, ten days after the lawsuit was filed. *Id.*; *see* Motion, Ex. 4 at ¶ 4. On April 28, 2023, a claims representative from LPO's insurance broker informed St. Paul's parent company of the lawsuit. Motion, Ex. 4. St. Paul maintains that this is the date it learned of the underlying state lawsuit. Complaint at ¶ 16; Motion at 2.

St. Paul brought this action against LPO on July 18, 2023, invoking the Court's diversity jurisdiction and seeking a declaration clarifying its duties to defend and/or indemnify LPO in the underlying state suit. On April 24, 2024, St. Paul brought the instant Motion, Dkt. No. 25. *See also* Dkt. No. 26 (LPO's Response to the Motion for Summary Judgment); Dkt. No. 28 (St. Paul's Reply). St. Paul's Motion seeks a declaration that it has no duty to defend and no duty to indemnify LPO in the underlying state lawsuit. Motion at 12.

## Analysis

**A.  Summary Judgment Standard**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show

that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

4

**B.     Insurance Policies in Texas Are Interpreted Like Contracts.**

"In Texas, insurance policies are interpreted by the same principles as contract construction." *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 454 (5th Cir. 2022) (citing *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010)). As the Texas Supreme Court has aptly explained:

> First, [courts] look at the language of the policy because [courts] presume parties intend what the words of their contract say. [Courts] examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless. The policy's terms are given their ordinary and generally-accepted [sic] meaning unless the policy shows the words were meant in a technical or different sense. Courts strive to honor the parties' agreement and not remake their contract by reading additional provisions into it.

*Gilbert Tex. Constr., L.P. v. Underwriter's at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (internal citations omitted).

"Initially, the insured has the burden of establishing coverage under the terms of the policy. If the insured proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion. If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Id.* at 124 (internal citations omitted).

   **1.**   *The eight-corners rule defines an insurer's duty to defend.* "[U]nder Texas's well-established eight-corners rule, an insurer's duty to defend is determined by the claims alleged in the petition and the coverage provided in the policy." *Century Sur. Co. v. Club Adventure Learning Ctr. LLC*, 674 F.Supp. 3d 362, 367 (W.D. Tex. 2023) (internal quotations omitted). In other words, the four-corners of the underlying pleadings, here the state court petition, and the four-corners of the insurance policy provide the basis for whether St. Paul has a duty to defend LPO in the underlying state lawsuit. "Courts resolve all doubts regarding the duty

to defend in favor of the insured." *Century Sur. Co.*, 674 F.Supp. 3d at 367 (internal quotation removed).

When applying the eight-corners rule, the Court consults the latest amended pleading in the underlying lawsuit, focusing "on the alleged facts and not on the asserted legal theories." *Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 528 (5th Cir. 2004). "[T]he duty to defend arises only when the facts alleged in the complaint, if taken as true, would *potentially* state a cause of action falling within the terms of the policy." *Id.* (emphasis in original). As previously stated, doubt is resolved in the insured's favor, but "[i]f the petition *only* alleges facts excluded by the policy, . . . the insurer is not required to defend." *Id.* (internal citations omitted) (emphasis in original).

### C. There Is No Dispute That the Underlying State Proceeding Is "a Claim or Suit for Injury or Damage."

The Policy states that St. Paul has "the right and duty to defend any protected person against a claim or suit for injury or damage or pollution clean-up costs covered by this agreement." Policy at 54. Under the Policy, a "[c]laim means a demand that seeks damages or pollution clean-up costs," "[s]uit means: a civil proceeding that seeks damages []," and "[i]njury or damage means: bodily injury, personal injury, or advertising injury; or property damage." *Id.* As defined elsewhere in the Policy, "[p]roperty damage means: physical damage to tangible property of others, including all resulting loss of use of that property; or loss of use of tangible property of others that isn't physically damaged." *Id.* at 49.

Here, the state lawsuit against LPO alleges that the landowner plaintiffs' property is "now contaminated with environmental pollutants . . . that have saturated the ground rendering it toxic to vegetation in the affected and surrounding areas." Petition at ¶ 12. This allegation describes a "loss of use" of "tangible property," that falls within the Policy's definition of "property

6

damage," which neither party to this proceeding disputes. *See generally* Motion, Response, & Reply. The lawsuit also seeks damages. *See* Petition at ¶¶ 16 & 17. As there is no meaningful dispute that the underlying state proceeding is a claim or suit for damages, the Court must next determine whether the underlying claims are for injury, damage, or pollution clean-up costs that are *covered* by the agreement.

### D.   The State Lawsuit Does Not Bring Claims for Covered Property Damage.

The Policy provides coverage for property damage that "happens while this agreement is in effect; and is caused by an event." Policy at 49. An "event" is "an accident, including: continuous or repeated exposure to substantially the same general harmful conditions; and a sudden and accidental pollution incident." *Id.* The Policy, however, excludes and does not cover damage that results from *pollution*, unless it qualifies as a "sudden and accidental pollution incident." *See id.* at 74.

Pollution, in the Policy, is "any actual, alleged, or threatened discharge, dispersal, escape, migration, release, or seepage of any pollutant." *Id.* at 51. "Pollutant means any solid, liquid, gaseous, or thermal *irritant or contaminant*, including: smoke, vapors, soot, fumes; acids, alkalis, chemicals; and waste." *Id.* at 50 (emphasis added). If the alleged damage to the landowner plaintiffs' property was caused either by an irritant *or* a contaminant, including waste, St. Paul has no duty to defend LPO unless some exception to the pollution exclusion applies.

   **1.**   *Courts have leaned on dictionary definitions to assess whether there has been contamination for the purposes of insurance coverage.* "Black's Law Dictionary defines contamination as 'a [c]ondition of impurity resulting from mixture or contact with foreign substance.'" *Cleere Drilling Co. v. Dominion Expl. & Prod., Inc.*, 351 F.3d 642, 651 (5th Cir. 2003) (quoting Black's Law Dictionary 318 (6th ed. 1990)). This definition of contamination is

7

itself taken from *Am. Cas. Co. of Reading, Pa. v. Myrick*, 304 F.2d 179, 183 (5th Cir. 1962), wherein the Court noted that a similar definition, used by the trial court in its jury charge, was "consistent with common understanding . . . which is the proper criterion for construing words in an insurance policy." *Am. Cas. Co.*, 304 F.2d 179 at 183. Alternatively, "*Webster's Third New International Dictionary* defines the verb, 'to contaminate' as 'to soil, stain, corrupt, or infect by contact or association . . . to render unfit for use by the introduction of unwholesome or undesirable elements." *Cleere Drilling Co.*, 351 F.3d at 651 (quoting Webster's Third New International Dictionary 491 (1986)).

Two Fifth Circuit cases provide guidance for our inquiry. In *Cleere Drilling*, the Court used both definitions above to examine whether an incident was excluded from coverage because it triggered a pollution exclusion. In its analysis, the Fifth Circuit stated that, as an example, "fresh water that would evaporate in a matter of days, or a fine layer of sand that would cause no impairment to the use of the surface of rural land, should not be considered contamination." In contrast, the Court explained, the need to utilize "temporary dams" and "vacuum trucks," ultimately "haul[ing] away and dispos[ing] of more than 3,900 barrels of waste fluids" were actions clearly "taken to minimize both the surface damage . . . and the need to eliminate foreign substances and undesirable elements that might render the surface of the land *unfit or undesirable for use*, indefinitely if not permanently." *Id.* (emphasis added). Calling back to the Webster's definition of "to contaminate" the Court therefore held that salt water, gas, sand, and drilling mud from an oil-well blowout were contaminants. *Id.* at 654.

Next is the Fifth Circuit's decision in *Eastern Concrete*, which involved a pollution exclusion with the same language as the policy here. *See Eastern Concrete Materials, Inc. v. ACE Am. Ins. Co.*, 948 F.3d 289, 294 (5th Cir. 2020). An Eastern Concrete quarry manager's

mistake resulted in substantial amounts of rock fines, the smallest particles that result from crushing and screening large stones, releasing into a nearby creek. *Id.* at 294-95. Ultimately, the Fifth Circuit reviewed the lower court's grant of summary judgment to the insurer on the absence of a duty to defend. *Id.* at 299. Contrasting the circumstances with those in *Cleere Drilling*, the Court found that rock fines did not fit either the definitions of "contamination" or "to contaminate" utilized in *Cleere Drilling*, as the rock fines neither mixed with the creek "in a way that made it impure," nor soiled, stained, corrupted, or infected the creek or "render[ed] it unfit for use." *Id.* at 301-02 (internal quotations omitted). However, the Court also examined the rock fines' effects on the overall ecosystem. *Id.* at 302. Even Eastern Concrete's counsel, who argued for finding coverage, described the rock fines as "a deleterious substance resulting in a negative impact to a trout producing stream and a documented habitat for threatened or endangered species."[1] *Id.* As a result, the Court concluded that the rock fines "rendered the creek unfit for use as a habitat for trout and other species," and found that this impact explained "why Eastern Concrete was required to remove the rock fines" from the creek. *Id.* The Court therefore held that the rock fines were contaminants under Eastern Concrete's policy and affirmed summary judgment in favor of the insurer. *Id.*

---

[1] LPO's Response includes this phrase, quoting directly from the *Eastern Concrete* trial court's order on Great American's Motion for Summary Judgment, but conspicuously trims the trial court's words, transforming, **"And, according to Eastern's counsel,** New Jersey also maintained Eastern had violated the Fish and Game Act 'by pumping of a deleterious substance. . . [.]'" into, "**New Jersey . . . maintained** Eastern had violated the Fish and Game Act 'by pumping of a deleterious substance . . . [.]" *See Great Am. Ins. Co. v. ACE Am. Ins. Co. et al.*, 325 F.Supp.3d 719, 724 (N.D. Tex. 2018) (emphasis added); Response at 15 (emphasis added). But the internally quoted statement was made by Eastern Concrete's counsel, in a letter to its insurer, describing New Jersey's claims against Eastern Concrete, without quotation to a New Jersey state entity. *See* Plaintiff Great American Insurance Company's Appendix in Support of its Motion for Summary Judgment at PA093-PA094, *Great Am. Ins. Co. v. ACE Am. Ins. Co. et al.*, No. 4:18-cv-00114-A (N.D. Tex. May 10, 2018), ECF No. 47. LPO's abbreviated quotation improperly insinuates that the internal quote should be attributed to the State of New Jersey.

**2.** *The wastewater described in the Petition qualifies as a contaminant.* The Petition describes that, "[a]s a result of [LPO's] actions and/or inactions, the Ranch is now *contaminated* with environmental *pollutants*[.]" Petition at ¶ 12 (emphasis added). Though the Petition itself uses the words "contaminated" and "pollutants," these are not the only alleged facts in the Petition that inform the Court's view. The Petition goes on to allege that the "pollutants" have "saturated the ground rendering it *toxic* to vegetation in the affected and surrounding areas." *Id.* (emphasis added). More specifically, the landowner plaintiffs allege that "all vegetation has ceased to grow" in "an approximately one-half mile long and twenty foot wide drainage area . . . since Defendant's two wastewater discharges." *Id.* at ¶ 13. Reading the Petition as a whole, the facts allege LPO's wastewater entered the landowner plaintiffs' land and saturated it with environmental pollutants, thereby rendering the affected ground toxic to vegetation.

Similar to *Cleere Drilling* and *Eastern Concrete*, these alleged facts indicate the drainage area has become unfit for its prior use. A substance foreign to the landowner plaintiffs' land has allegedly caused toxicity and a lack of growth, echoing both the Black's Law definition of "contamination" and Webster's definition of "to contaminate" that prior courts have found helpful. Further, the Petition provides that "wastewater" was displaced "into, over, and across" the landowner plaintiffs' property such that "environmental pollutants" have "saturated the ground," and rendered it "toxic to vegetation." Petition at ¶¶ 11-12. It is plain from the Petition that the wastewater is alleged to have mixed with the ground on the landowner plaintiffs' property, and, in doing so, rendered it toxic.

**3.** *The Court declines to adopt LPO's view that the Petition alleges three categories of damages.* LPO asserts that the Court should view the Petition as pleading "three

categories of damages: (1) damages caused by water; (2) a subset of those damages caused by mysterious unidentified 'environmental pollutants;' and (3) a further subset of damages supposedly caused by some unquantified amount of some type of 'salts.'" Under this view, the Court would evaluate whether each category constitutes covered damages under the Policy and, if any of them do, find that St. Paul has a duty to defend.

Though at this stage of the litigation facts must be viewed in the light most favorable to LPO, as the non-movant, the Petition cannot reasonably be read as describing subsets of damages caused by different substances. On its face, the Petition pleads that all damages arose from a single source—the wastewater. And while it is true that the Petition could be read to suggest that the wastewater *contained* environmental pollutants and salts, those components make up the wastewater. There is no allegation that salts or environmental pollutants separate from the wastewater caused damage; it is instead the salts and pollutants *in the wastewater* that allegedly caused the harm.

Moreover, the Petition only alleges damages from *wastewater*, never just "water." *See* Petition. LPO nonetheless insists that "[t]he Court must treat [the underlying] allegation as nothing more than the water damaged the property," as "attaching the compound adjective 'waste' to 'water' to allege damage caused by some undefined substance known as 'wastewater,' **without further factual specification** does not magically transform [the underlying] allegation into anything other than that some unspecified type of 'water' caused the damage." *See* Response at 7 (emphasis in original). Reading the Petition in a light most favorable to LPO does not mean rewriting it. The Court will not replace words in the Petition such that "water" is read every time "wastewater" is written. That is not interpreting a document, it is redrafting it. Moreover, the landowner plaintiffs' allegation that the property where the wastewater originated was an "oil

11

field byproduct wastewater disposal well" provides important context to show that the landowner plaintiffs were not merely attaching "waste" to "water" throughout the Petition. Petition at ¶ 10. Finally, reading "water" wherever the Petition mentioned "wastewater" would be incompatible with the Petition's other allegations, which include damages beyond what one might expect would be caused by water alone.

> E. Under the Facts Alleged, the Sudden and Accidental Pollution Incident Exception Cannot Apply.

There is one exception to the pollution exclusion under the Policy: a sudden and accidental pollution incident. This exception references "the discharge, escape, or release of a pollutant that: is sudden and accidental; is first known within 30 days of its beginning by you . . . ; any protected person . . . attempts to end as soon as possible after it first becomes known by you . . . ; and is reported to us under this agreement within 90 days after it first becomes known to you . . . ." *Id.* at 51-52. "Sudden means abrupt and immediate." *Id.* at 52. "Accidental means unexpected and unintended." *Id.*

The Petition does not allege that the two events in question occurred suddenly and accidentally, nor slowly and purposefully.[2] All ambiguity must be read in favor of the insured; all facts must be read in a light most favorable to the non-movant, Defendant LPO. It is entirely possible that the wastewater discharges alleged in the Petition happened suddenly and accidentally. Plaintiff doesn't argue otherwise. The Court will therefore assume for this portion of its analysis that the circumstances alleged in the Petition were both sudden and accidental.

---

[2] It could be argued that the second wastewater discharge in August was not unexpected, given that the first discharge had occurred only two months prior. Plaintiff St. Paul made no such argument in its Motion for Summary Judgment, however, nor would the argument be dispositive here.

The Court will make a similar "for argument's sake" assumption for the exception's requirement that a "protected person" attempted to end the pollution incident "as soon as possible" after it first became known to LPO. *See id.* at 51-52. The parties didn't brief the issue, and the existence of such prompt action would be favorable to LPO's pursuit of coverage. The Court will therefore also assume here that a "protected person" acted immediately to halt the pollution incident once it became known.

Even with these assumptions in place, LPO cannot show that it meets the exception's notice requirement. The exception requires that the insured notify the insurer within 90 days after a sudden and accidental pollution incident becomes known to the insured. *Id.* at 51-52. But there is no question that the notice provision was not satisfied, and LPO doesn't argue otherwise. LPO's interrogatories state that the company learned of the June incident on or about June 14, 2021, and of the August incident on or about August 27, 2021. Motion, Ex. 3-A at 2-3. LPO notified CBS Insurance, LPO's insurance broker, of the underlying state lawsuit on or about April 28, 2023. *Id.*; *see* Motion, Ex. 4 at ¶ 4. That same day, a CBS claims representative informed The Travelers Companies, Inc., the parent company of St. Paul, of the lawsuit. Motion, Ex. 4. Far more than 90 days had therefore passed since LPO learned of the incidents, and LPO therefore failed to timely notify St. Paul of the incidents.

The allegations in the state lawsuit are therefore not subject to the sudden and accidental pollution incident exception to the pollution exclusion in LPO's Policy. And the Policy therefore excludes the claims in the underlying state lawsuit from St. Paul's duty to defend, and St. Paul should be granted summary judgment on its assertion that it has no duty to defend here. *See Pogo Res. LLC v. St. Paul Fire & Marine Ins. Co.*, 2022 WL 286206, at *12-*13 (N.D. Tex. Jan. 31,

2022); *see also Matador Petrol. Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 660 (5th Cir. 1999).

**F.     St. Paul Is Not Entitled to Summary Judgment on Its Duty to Indemnify.**

St. Paul also seeks a declaratory judgment on its duty to indemnify LPO, which involves a separate inquiry from the duty to defend. The duty to indemnify is based "upon the actual facts that underlie the cause of action and result in liability," and "[i]f any ambiguity exists, exceptions and limitations in a policy are construed strictly against the insurer." *Northfield Ins. Co.*, 363 F.3d at 528-29 (internal quotations omitted). "Generally, Texas law only considers the duty-to-indemnify question justiciable after the underlying suit is concluded, unless the same reasons that negate the duty to defend likewise negate *any possibility* the insurer will ever have a duty to indemnify." *Id.* at 529 (internal quotations omitted and emphasis added). Comparatively, if a duty to defend is found, the question of a duty to indemnify is rendered nonjusticiable at that time. *Id.*

The opinion from the Texas Supreme Court in *Griffin* provides a clearcut example of when the reasons that negate the duty to defend likewise negate *any possibility* that the insurer will ever have a duty to indemnify. *See Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997). Farmers, the insurer, sought a declaration that it had no duty to defend or indemnify its insured, who faced tort claims for his role as the driver in a drive-by shooting. *Id.* at 81-82. The insured's policy provided coverage for bodily injury or property damage arising from an auto accident. *Id.* at 82. The Court found that the trial court had properly ruled that Farmers had neither a duty to defend nor to indemnify their insured. *Id.* After confirming that Farmers had no duty to defend, in part because a drive-by shooting could not conceivably constitute an accident under the policy, the Court explained, "No facts can be developed in the underlying tort suit that can transform a drive-by shooting into an 'auto accident.' Farmers has

14

no duty to defend, and, for the same reasons, has no duty to indemnify Royal." *Id.* at 84. At the pretrial, this case doesn't present anything like the gulf between an intentional drive-by shooting and a negligent auto accident.

Moreover, in *D.R. Horton-Texas*, the Court revisited *Griffin*, stating that "[t]he holding in *Griffin* was fact-specific and cannot be construed so broadly" as to suggest that, "if the terms of the policy, when read in light of the allegations asserted in the petition, do not give rise to a duty to defend, then proof of all of those allegations could not give rise to a duty to indemnify." *D.R. Horton-Texas, Ltd. v. Markel Inter. Ins. Co., Ltd*, 300 S.W.3d 740, 744 (Tex. 2009). *Griffin* "was not based on a rationale that if a duty to defend does not arise from the pleadings, no duty to indemnify could arise from proof of the allegations in the petition." *Id.* at 745. Rather, in some cases, "it may be necessary to defer resolution of indemnity issues until after the underlying third-party litigation is resolved because coverage may turn on facts actually proven in the underlying lawsuit." *Id.*

The Court noted that "other terms, conditions, exclusions, or exceptions in the policy or other proof may establish or refute, before or during trial" a duty to indemnify. *Id.* Given this, "[t]he insurer and the putative insured may introduce evidence in coverage litigation to establish or refute the insurer's duty to indemnify. Where disputed facts are proven in the liability case, whether none, some, or most of the material coverage facts have been established in that underlying suit depends on the circumstances of the case and other legal and equitable principles." *Id.*; *see also Burlington Northern & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 334 S.W.3d 217, 220 (Tex. 2011) (per curiam). The insured party in *D.R. Horton-Texas* "presented evidence" in its summary judgment response that raised fact questions

that defeated summary judgment on the insurer's duty to indemnify. *D.R. Horton-Texas, Ltd.*, 300 S.W.3d 740 at 745.

Neither St. Paul nor LPO have considered the possibility of a split decision following a finding that St. Paul has no duty to defend. For example, LPO has not presented any outside information, like the insured party in *D.R. Horton-Texas* did, that a fact question exists on St. Paul's duty to indemnify. The initial burden at summary judgment is on the moving party, however, who here has offered no argument or authority for its asserted lack of a duty to indemnify, other than recitations of the rule in *Griffin* from a variety of cases. *See* Motion at 9; Reply at 11-12. St. Paul is therefore not presently entitled to summary judgment on its duty to indemnify.

## Conclusion and Recommendation

For the reasons discussed above, it is recommended Plaintiff's Motion for Summary Judgment should be **GRANTED IN PART** and **DENIED IN PART**.

## Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Objections, responses, and replies must comply with the same page limits as other filings, unless otherwise excused by the district court's standing orders. *See* Rule CV-7. The objecting party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing

objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED**.

SIGNED this 27th day of February, 2025.

_____
RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE